UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NO. 1:20-CV-11

STEPHEN DOUGLAS PARKER,                )
                                       )
                Plaintiff,             )
                                       )
        v.                             )
                                       )
CASE FARMS, LLC, and GUY PERKINS,      )
                                       )
                Defendants.            )
                                       )
_____)

## **VERIFIED COMPLAINT**
## **(JURY TRIAL DEMANDED)**

COMES NOW, the Plaintiff, Stephen Douglas Parker, and files this Complaint against the Defendant, Case Farms, LLC for violation of the federal Packers and Stockyards Act of 1921, and federal Declaratory Judgment Act, as well as willful breach of contract, declaratory judgment, fraud, negligent misrepresentation, temporary restraining order and preliminary injunction, violation of Chapter 75 of the North Carolina General Statutes, and as to both Defendants Case Farms, LLC and Guy Perkins, defamation. Plaintiff seeks compensatory damages, treble damages or punitive damages, interest, attorneys' fees, costs, and injunctive relief prohibiting Defendants' continuing wrongful conduct.

## **PARTIES**

1.      The Plaintiff, STEPHEN DOUGLAS PARKER, is an individual citizen and resident of Burke County, North Carolina.

2.      Defendant, CASE FARMS, LLC, is a North Carolina limited liability corporation, with its principal place of business in Troutman, North Carolina, in Iredell County, North Carolina.

3.      Defendant, GUY PERKINS, is an employee of Case Farms, an individual citizen and resident of Lincoln County, North Carolina.

## JURISDICTION AND VENUE

4.      Plaintiff's federal claims arise under the Packers and Stockyards Act, 7 U.S.C. § 181, et seq. and federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 2002.[1]  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331, and 7 U.S.C. §§ 209.

5.      This Court has supplemental jurisdiction over pendant claims arising under North Carolina law pursuant to 28 U.S.C. §1367.

6.      This District is proper venue under 28 U.S.C. §1391 because all of the parties are residents and domiciled in this District and the events in this lawsuit, concerning Case Farm's illegal contract with Plaintiff, and illegal termination of that contract, and Defendants' defamation of Plaintiff, all occurred in this District as well.

## FACTUAL ALLEGATIONS

7.      Defendant Case is a large poultry dealer, slaughtering and shipping for consumption, millions of pounds of chicken each week.

8.      Case operates as what is known as an "integrator." It controls each and every aspect of raising chickens, slaughtering them, and selling their meat.  Case's various chicken meat products come from broilers-chickens genetically altered to produce so much breast meat that their bones often cannot properly support their body-that are born in Case's hatcheries, from eggs laid by Case's hens, and which remain Case's property throughout their entire lives. The broilers are grown on feed formulated and provided by Case, in conditions regulated by Case. Each bird is allotted less than one square foot of space in the broiler houses. Additionally, the

---

[1] Plaintiff acknowledges that the federal Declaratory Judgment Act is not an independent source of federal jurisdiction.

2

broilers are treated by veterinarians hired by Case, according to Case's standards and rules. They are slaughtered on the date Case selects, in Case's plants, and where Case's employees evaluate the birds to determine whether they are fit for human consumption. If so, they are sold based on Case's pre-existing contracts with various purchasers.

9. In this system, so-called farmers/independent contractors like the Plaintiff are known as "growers." They grow the broilers based upon contract terms dictated by Case. Growers, including Plaintiff, cannot negotiate the terms of these contracts, are told they "must" sign them there on the spot, without consulting legal counsel, and are not given copies of such contracts at the time of signing nor until years later if at all. Thus, these contracts are contracts of adhesion.

10. Under these dictated contracts, the growers bear virtually all the risk. They are responsible for building and maintaining the facilities on their farms in which the broilers are cared for, relying on Case's false representations regarding its commitment to its growers and their future earnings. They are required by Case to take out massive loans, using documentation prepared by Case for the loan applications. Typically, these loans are guaranteed by the United States taxpayer, for which they are personally responsible. In return, Plaintiff is paid based on a "tournament system," in which all growers whose chickens are slaughtered within a given time period compete with one another.

11. Case disguises its virtual control of the outcome of the tournament through calculating the ranking of each grower to the ten-thousandth of a percent by averaging the so-called efficiency of a grower's production in the tournament instead of providing the growers with the outcome of each house even though Case has this information available. The top producing growers - as solely determined by Case - are paid a premium over and above a so -

3

called "base price," and the lower ranked growers are subjected to offsetting discounts or deductions below the "base price." This is "robbing Peter to pay Paul".

12. This tournament system ensures that Case's costs are consistent, but the growers can neither predict nor control their pay. Indeed, Case so dominates the growers that the growers are in effect "maintenance workers" or "sharecroppers" for Case. Growers, like Plaintiff, take out millions of dollars in loans to build their farms to Case's specifications, and then have no way to repay such loans other than to do exactly as Case says, without ever voicing objection, or risk financial ruin and bankruptcy, as happened to Plaintiff.

13. Case controls all of the aspects of genetics, nutrition, health and virtually all aspects of the environment in the grow-out process. In all probability, the growers may influence two percent 2% of these aspects in the grow-out process. Case literally controls its broiler production process from the egg to the plate. Through the illegal contracts of adhesion that it imposes on growers, Case controls the following aspects of the grow-out process, all of which directly impact the weight of the chickens at the end of the grow-out process, and thereby the amount of remuneration the grower receives from Case.

    a. Case unilaterally controls the drafting, language and terms of the poultry growing agreement.

    b. Case controls the type and condition of the houses required on a grower's farm.

    c. Case controls the contractors who are permitted to construct houses on a grower's farm.

    d. Case controls the type and condition of the equipment required on a grower's farm.

    e. Case controls whether or not upgrades (improvements) are required on a grower's farm.

    f. Case controls the condition of the grower's farm adjacent to the poultry houses.

4

g.  Case controls the required maintenance of the land around the poultry houses.

h.  Case controls the type and kind of animals allowed on a grower's farm.

i.  Case controls the type of pest control allowed on a grower's farm.

j.  Case controls the genetics of the birds and the sex of birds delivered to growers' farms.

k.  Case owns and/or controls the pullets that are used to produce laying hens.

l.  Case owns the laying hens that produce the broiler eggs hatched by the laying hens.

m.  Case owns the eggs that are hatched by the laying hens.

n.  Case owns and controls the hatchery where the eggs are hatched.

o.  Case owns the broiler chicks that are hatched.

p.  Case controls the medication for the eggs and birds and the administration of the medication.

q.  Case controls the type of birds that each grower is given.

r.  Case controls the health and condition of the birds delivered to a grower.

s.  Case formulates and owns the feed provided to growers and its nutritional value.

t.  Case controls the additives included in the feed.

u.  Case controls the type of feed delivered to a particular grower and timing of changes to the feed ration for that grower's chickens.

v.  Case controls if a grower gets reclaimed (old) feed.

w.  Case determines when the birds will be delivered to a grower.

x.  Case controls whether a grower receives veterinary services.

y.  Case controls when veterinary services are provided on the grower's farm.

z.  Case controls when and which birds must be killed (culled) by a grower.

aa.  Case controls the service technician that oversees each grower's farm.

bb.  Case controls the environment the birds are grown in.

5

cc. Case controls the temperature of the poultry houses the birds are grown in.

dd. Case controls the airflow of the poultry houses the birds are grown in.

ee. Case controls the lighting of the poultry houses the birds are grown in.

ff. Case controls when the birds will be picked up for processing.

gg. Case controls the "catch crew" which picks up the birds for processing.

hh. Case controls the transporting of the birds to the processing plant.

ii. Case controls the weighing of the birds.

jj. Case controls the amount of time between catching the birds and weighing the birds.

kk. Case controls the amount of time between weighing the birds and processing the birds.

ll. Case even controls the disposal of the excrement of its birds.

mm. Case controls the condition and environment of the farm and poultry houses before new flocks will be delivered to the grower's farm.

nn. Case controls how long growers are held out between flocks.

oo. Case controls how many flocks a grower receives.

pp. Case controls the tournament system and income of the growers.

qq. Case controls recording of factors (weight, etc.) that determine a grower's income, without a grower having proper means of verifying the numbers alleged by Case.

rr. Case controls whether a grower's flock is excluded from the tournament thereby affecting all growers' pay.

ss. Case controls whether a grower's flock gets an exception thereby affecting all growers' pay.

tt. Case controls which growers are ranked against each other.

14. Under this one-sided arrangement, the growers are subject to the strict and unrelenting control of every detail by Case. The only thing a grower can truly call his/her own is the extensive debt that is accumulated as a direct result of meeting Case' strict demands.

6

15. As all local growers working for Case are required to do, Plaintiff entered into an unconscionable adhesion grow-out contract with Case titled "Broiler Production Agreement".

16. Once the growers receive the chicks they care for the chicks for approximately 60 days or 8.5 weeks depending on Case's required weight of the bird at the end of the grow-out process.

17. Case is easily able to exert such control and enforce such unconscionable arrangements because it is virtually the only broiler integrator to which the local growers can turn. There is virtually no other viable option, especially when Case defames and lies to the community about a farmer, as Plaintiff has been painfully made aware since Case unlawfully terminated the poultry growing arrangement. The Production Agreement gave Case monopoly power over Plaintiff and all the other growers by entangling them in Case' archaic, abusive and unconscionable payout system, better known throughout the industry as the "tournament system."

18. This scheme benefits Case in many ways. Case is able to exercise all the control that an employer would exercise over an employee, but with none of the responsibility. Case does not have to pay the grower minimum wage or overtime nor is it subject to the North Carolina Wage and Hour Act; can literally require the grower to be on call 24 hours a day, seven days a week; is not responsible for workers compensation or unemployment insurance; is not liable under Title VII or the North Carolina law for discrimination claims; and, can force the grower to bear all the costs of building and equipment maintenance and any upgrades it sees fit to require, as here where Plaintiff was forced to take out burdensome loans just to pay for the privilege of caring for Case's chickens.

7

19.     The compensation for growers such Plaintiff is meted out according to the so-called "tournament system."  Plaintiff was ranked against other Case growers whose flocks were also processed in the same period, based upon the "Marketable Broiler Live Weight" (basically the weight of the chickens when fully grown), divided by the "Weighted Average Formula Cost" (the cost of feed and medication Case had to supply to care for the chickens).  Presumably, this tournament system should start with a level playing field for all the growers, but such is not the case.  The values upon which the tournament system is based are in no small part determined by the quality of chickens, feed and medicine provided by Case to the individual growers.

20.     Case defrauded Plaintiff through the tournament system and subjected Plaintiff to unlawful practices by unilaterally imposing and utilizing a ranking system that can be, and in fact was, arbitrarily and capriciously manipulated.  By ranking individual growers, including Plaintiff, Defendant wrongfully pits each grower against the other, arbitrarily punishing what Case deems to be a less successful grower based upon criteria which are virtually under the total control of Case, and which are never revealed, explained or discussed with the growers.

21.     The tournament system is designed to increase Case's profits at the expense of, and to the severe detriment of, its growers, including Plaintiff, and thereby decreasing the profits of its growers, including Plaintiff.  Case defrauded Plaintiff by unilaterally imposing and utilizing the tournament system, which wrongfully placed Plaintiff in competition with his fellow growers, all the while requiring Plaintiff to accept chicks that are genetically different, and chicks in varying degrees of health.  Likewise, the feed supplied by Case is of dissimilar quantity, quality and consistency, and is often delivered inappropriately and in an untimely manner.  Plaintiff was ranked against each of the other growers even though they possessed dissimilar facilities, equipment and technology.  Additionally, Plaintiff received differing

degrees of technical assistance and was required to comply with management practices that were inconsistent with his fellow growers.

22.     The end result of the tournament system is the imposition of an arbitrary and capricious ranking of each grower, which is designed to insure Case's ability to wrongfully control its cost of operations at the expense of its growers, including Plaintiff, and to maintain undue financial dominance over Plaintiff and his fellow growers.  Under this arbitrary and capricious system a chicken grower can rank at the top of his group for one flock, and then just eight weeks later, using the exact same animal husbandry practices, rank at the bottom of the group for the next flock.

23.     Despite its arbitrary internal ranking system, Case receives the same sale price for its comparable products sold no matter the type of facilities and equipment that were located on the farm where the chickens were cared for.  Case's tournament system is the classic "rob Peter to pay Paul" scenario that is unfair, unjustly discriminatory and deceptive, as well as unduly and unreasonably prejudicial and disadvantageous to Plaintiff and their fellow growers.

24.     Case has and continues to fraudulently conceal from said growers, including Plaintiff, material facts regarding the detrimental effect to said growers, including Plaintiff, resulting from the tournament system.

25.     The key variables that determine growers' scores, ranking, and ultimately, their compensation, are entirely under Case's control and therefore subject to manipulation without detection by the growers, enabling Case to artificially depress a particular grower's payout, and which it did manipulate, in fact, to artificially depress Plaintiff's payouts.

26.     The inequity of the tournament system was exposed in an online poultry publication article about a study done by the Poultry Science Association discussing the importance of certain determinative factors involved in the broiler grow-out process.

27.     The Poultry Science Association ("PSA") was established in 1908. According to its webpage, https://www.poultryscience.org, the PSA is a professional organization consisting of approximately 1,800 educators, scientists, extension specialists, industry researchers, administrators, producers, and college students who are committed to advancing the poultry industry. Since 1908, PSA has maintained a level of prestige that ranks it among the top professional organizations in the field. For over a century, PSA's member scientists have contributed through their research to the progress of the poultry industry and the development of safer and more nutritious food products for the consumer. Throughout this period, PSA has served - and it continues to serve - as the premier clearinghouse and publisher of basic and applied poultry research in the world. The application of research findings published in PSA's journals has been and remains a major contributor to the rapid growth and maturation of the meat and egg industries. In addition, poultry-related research has made substantial contributions to the overall understanding of human health and nutrition. Its webpage lists its objectives as follows:

k.  **To stimulate the discovery, application and dissemination of knowledge.**
l.  **To create a forum for the exchange of information among various segments of the poultry industry.**
m.  **To publish original research, reviews and timely information in the official PSA publications: Poultry Science® and the Journal of Applied Poultry Research.**
n.  **To recognize outstanding professional achievement.**

28.     In July of 2011, the PSA sponsored a symposium in St. Louis addressing the future of the poultry industry, hot topics of current economics, and questions surrounding the future of food agriculture. Experts in poultry science examined the fields of genetics, nutrition,

hatchery management, vaccination/immune modulation, coccidiosis control and antibiotic use. It was discussed and reiterated in an article written by Christine Alvarado, Ph.D., a Professor at Texas A & M University and published by WATT Ag Net.com, https://www.wattagnet.com/articles/10194-genetics-plays-large-role-in-poultry-industry-s-future. Portions of her article stated as follows:

> "The reason the industry has been so successful is improvements in genetic potential of breeds to achieve efficient production standards with proper nutrition, environmental management and health. Based upon the overall conclusions of the symposium, genetics is critical to the successful future of the industry. According to Leeson, genetics account for 90% of the current and future status of the poultry industry, while the remaining criteria of nutrition (5%), environment (3%) and health (2%) are considered supporting roles."

29.    Although Case controls at least 98% of the of the grow-out process it ranks growers as if they alone determine the outcome of the grow-out process thereby shifting all of its economic risks in the grow-out process to the growers thereby using the tournament system (settlement) as an unfair, unjustly discriminatory and deceptive rigid cost controlling device. This allows Case to pay its growers in a manner that causes huge swings in the amount of compensation each grower receives in any given settlement. This is done even though there are countless variables controlled by Case that exist between the inputs into the grow-out process on each grower's farm.

30.    Not surprisingly, the federal government recently also determined that poultry farmers, like the Plaintiff, lack the independence needed to justify the award of small business loans. In the Executive Summary of a March 2018 report entitled, "Evaluation of SBA 7(A) Small Business Administration Loans to Poultry Farmers," the Inspector General of the Small Business Administration (SBA OIG) summarized their findings:

> "We found that 7(a) loans made to growers did not meet regulatory and SBA requirements for eligibility. The large chicken companies (integrators) in our

11

sample exercised such comprehensive control over the growers that the SBA Office of the Inspector General believes the concerns appear affiliative under SBA regulations. Specifically, in our review of a sample of 11 7(a) loans made to growers, as well as a review of defaulted 7(a) loans to growers, we found integrator control exercised through a series of contractual restrictions, management agreement, oversight inspections, and market controls. This control overcame practically all of a grower's ability to operate their business independent of integrator mandates.

This control was enforced through close integrator oversight, management agreements, and grower-integrator communication. A grower's failure to comply with these requirements could result in a significant decrease in integrator payments, a reduction in flock placements, or a cancellation of the contract. A grower's economic viability was based upon a performing production contract with an integrator and is the true basis for grower income and facility value."

The report goes on to state "entities are affiliates of each other when one controls or has the power to control the other. It does not matter whether control is exercised, so long as the power to control exists." The SBA OIG went on to state that their "observation of such control was further supported by research, studies, and reports from governmental, academic, and trade publications, as well as interviews with various lenders, growers, and staff of Federal agencies and academic institutions."

### Case's Use of Its Domination to Exploit, Retaliate Against, and Defame Plaintiff

31.    Plaintiff's grandfather acquired his farm in Burke County, North Carolina in 1941. His mother and her siblings were born and raised on the farm. Plaintiff and his siblings were also raised on this same farm. Plaintiff acquired the farm when his father passed away in 2005, and thereafter entered discussions with Defendant Case Farms to build chicken houses on his farm.

32.    In these preliminary discussions with Case, they provided him with detailed financial projections (see Ex. "1" attached hereto), which Plaintiff provided to his bank, Carolina Farm Credit, to secure $1 million in loans, secured upon title to his family farm, to initially build

and equip his chicken farm. Experience has shown that these projections provided by Case were wildly incorrect.

33.     Case Farms has at all times known that these financial projection sheets are relied upon by growers, like Plaintiff, and their banks, in deciding whether to enter into contracts with Case. Case has known at all times that its financial projections provided to growers, like Plaintiff, are wildly incorrect, and yet does nothing to correct such financial statements nor advise or inform growers of their falsity. Upon information and belief, Carolina Farm Credit will no longer underwrite new chicken farm construction loans for Case growers because Carolina Farm Credit found Case's financial projections to be completely unreliable, and that farmers growing chickens for Case, like Plaintiff, lose money, they do not make money. Case has known this at all times and deliberately misrepresented the opportunity for financial profit to growers like Plaintiff, as well as to banks, all of whom rely upon Case to their detriment.

34.     In 2012, Plaintiff signed his first contracts with Case, attached hereto as Exhibit "2", for a twelve (12) year term, renewing automatically. Case employees told him he had to sign the 2012 contract without modification, was not allowed to consult with an attorney before signing, and was not provided with a copy of the contract at the time he signed it. The 2012 Contracts contain no arbitration clause, provide no advance notice of termination of the contract, and no right to cure any alleged breach of contract.

35.     In 2012, Case provided Plaintiff with business cards of the only contractors he was allowed to use to build his farm. Copies of such business cards are attached as Exhibit "3". He was provided a construction binder specifying all aspects of construction required by Case; attached as Exhibit "4".

13

36.    In 2012, when Plaintiff asked Case managers about the term of his contract, they told him "look around at the other chicken farmers in the area; the average age is 88! Son, you can continue to grow chickens for us until you retire."  Plaintiff was 31 years old at the time, with a wife, one young child, and another baby on the way.  Plaintiff relied upon this and multiple other similar statements about being able to grow chickens for Case "until he retired."

37.    Plaintiff received his first flock on January 10, 2013.  After each flock, Plaintiff receives from Case detailed calculations on his "performance" under their "tournament system", measuring how efficiently the chickens convert feed into body weight, how much weight they gain per day, and mortality percentages.  At all times, with every flock through his last, delivered in October 2019, Plaintiff has ranked above average or near the top in all statistical categories in Case's "tournament system".  Plaintiff's flock performance information is attached in group as Exhibit "5" hereto.

38.    In 2016, Plaintiff was finally able to build another four chicken houses on his farm, bringing his total to eight (8) chicken houses, which Case convinced him he absolutely had to do in order for his farm to "cash flow".  Such statements by Case were absolutely false, however, intentionally designed to induce Plaintiff to take on more debt.  Plaintiff was required to borrow another $1.2 million from the local bank, again secured upon title to his family farm, in reliance upon false statements and financial promises of potential profits by Defendant Case, as well as Case's promises to continue to supply chickens to Plaintiff until he was ready to retire.

39.    Though he has eight houses, and receives roughly 150,000 chickens per flock, he is competing in Case's tournament system against other farmers with only one or two houses. This is grossly unfair to Plaintiff.

14

40.     In 2016 with construction of his new chicken houses, Defendant Case made him sign a new Broiler Agreement; attached as Exhibit "6".  Case's employee told Plaintiff that he "had to sign it right now", and that it was "identical to the prior one."  He was not given any time to read it before signing, much less any opportunity to consult with legal counsel.   In fact, the 2016 Agreement adds a new "arbitration" provision not present in the 2012 agreement. As addressed below, the 2016 agreement arbitration provision does not clearly and conspicuously identify his right to decline arbitration, nor the costs of arbitration.  It has no advance notice of termination, nor right to cure alleged breach.  Plaintiff was not provided with a copy of the 2016 agreement at the time he signed it, and indeed not until years later; even now the copy he was provided by Case is missing pages!

41.     With eight houses, Plaintiff receives approximately 155,200 chickens per flock, averaging 4.5 flocks per year.  Plaintiff is paid on average roughly $90,000 per flock, as a top performer, or roughly $405,000 per year in revenue, out of which he must pay his $1.6 million mortgage.  Case deducts from his pay any expenses, such as pesticide that Plaintiff must order from Case.

42.     In 2016 and 2017, in order to keep up with the thousands of chickens that die, Plaintiff obtained a grant to build a state of the art "composter".  If Plaintiff stops farming in less than seven years, he must pay back the $200,000 grant.  Case is very much aware of his composter, and grant, and Plaintiff's duties under the grant.

43.     Plaintiff was such an outstanding and model farmer, that Case participated in an unprecedented open house at Plaintiff's farm.  See, Exhibit "7".   Case brought its buyers, and other members of the community to tour Plaintiff's farm as a showpiece.  In fact, Case

management regularly brought clients and buyers to Plaintiff's farm to show off his farm as a model showpiece.

44.     Once a flock was delivered, Plaintiff would then care for the birds according to strict and meticulous guidelines imposed by Case.  When the flock matured, normally a sixty one day process, Case would transport the flock to its processing facility.

45.     Case's representations that Plaintiff would continue to receive chickens was the primary inducement for him to enter into the agreement with Case as well as to expend funds to improve his chicken houses. A well-constructed poultry house has an average life span of approximately 30 years.  However, with proper maintenance and improvements its life span can increase to 45 to 50 years. Plaintiff needed fifteen (15) years just to pay off the indebtedness.

46.     Case knew that their representations to Plaintiff that he would continue to receive chickens as long as he grew good birds were false and misleading, and were intended to induce Plaintiff to build his facilities in 2012 and 2016, and 2017, at his expense, a precondition to Case's continuing to contract with Plaintiff.

47.     Case designates one of its employees to oversee the operations of a particular grower such as Plaintiff. Some of the flock supervisors/service technicians (service techs) who controlled operations of Plaintiff were Matt Lane, Jeremy Speagle, David Smart, Kevin Martin, Jacob Taylor, Tim Frankie, Brody [Last Name Unknown], Daniel Beach, and Guy Perkins.  Case specifically said it assigned its most junior and inexperienced service men to work with its best growers.  Case, viewing Plaintiff as its best, therefore sent Plaintiff a service tech who had never before worked with chickens, and was only the week before was changing oil at Jiffy Lube! Such were the "resources" made available to Plaintiff for advice and guidance.

48.     Case and its service techs and management exercised control over every aspect of Plaintiff's grow-out operation as described in paragraphs above.

49.     Case knowingly made, and continues to make, materially false representations, both written and oral, about future income, costs, expenses, company policies and working relationships to Plaintiff, or concealed related material facts and information, including but not limited to, the "tournament system" and the inequities related thereto to accomplish this inducement, knowing that Plaintiff were ignorant as to the falsity of these representations and that it would accept them as the truth and rely thereon to its own consequence and proximate injury.  Plaintiff was required to financially encumber real and personal property and to convert its real property to a sole use thereby functionally depreciating said property and devaluing said property and rendering Plaintiff as a mere tenant, totally at the mercy of the Defendant.

50.     During the course of their relationship prior thereto, and continuing to the present Case materially misled Plaintiff as to the financial prospects of growing poultry for Defendant. Case was aware that said profit projections were false and misleading when made and has been guilty of malice and bad faith in making said material misrepresentations.

51.     Case has at various times altered the nutrition in the feed given to birds, without telling farmers like Plaintiff.  These changes in nutrition have effects upon the birds, causing conditions such as overheating, and increased mortality.  Such mortality increases decrease Plaintiff's profits, entirely beyond his control.  Case knows this and uses such nutrition changes as a way to exert control over Plaintiff and intentionally manipulate Plaintiff's profits.

52.     In December 2018, Plaintiff was experiencing a very unusual spike in mortality. He called managers at Case, but nobody would return his calls for over five days.  With dead birds piling up by the hundreds, Plaintiff left a voicemail in which he said that such high

17

mortality of birds amounted to animal cruelty, would someone from Case please return his phone calls and come see what was wrong with his birds. In this phone call, Plaintiff said that if Case would not help him then he could call the news media and show them the deplorable and cruel conditions of thousands of chickens dying. Plaintiff began calling other Case growers in the region, and found out they were experiencing the same conditions, but were all afraid of Case's retaliation and were afraid to make any complaints to Case.

53. Even though his per flock production remained high on Case's tournament system, beginning in December 2018, Case began to retaliate against him, culminating in false statements in the community defamation, and the wrongful termination of his contract, destroying any possibility for mitigating chicken contract with another grower, with the specific malicious intent of driving him into bankruptcy, losing his family farm, to make an example of him to other Case growers in the region.

54. Case instituted a "density reduction plan", whereby if a grower was experiencing higher mortality, their number of chickens would be reduced until conditions improved. See, Exhibit "8". Not only did Case never place Plaintiff on any performance improvement or density reduction plan, Case actually increased his delivery of chickens! Plaintiff was not at any time provided any warning, written or oral, that his contract might be in breach, or his performance in any way lacking.

55. Plaintiff has not in any way refused or rejected the direction of Case in the operation or management of his farm. For example, he was specifically told at all times by Case management (Bradley Shore and Doug Hatley) that he should only change the floors of his chicken houses every two years. Before any new flock was delivered to his farm, Case employees would inspect his farm to determine it was suitable for delivery, and on every

occasion he passes such inspections with flying colors.  See, Exhibit "9", pre-delivery inspection reports.  Plaintiff purchased new floors, borrowing another $9,200 to do so in Summer of 2019.

56.     Plaintiff receives weekly visits from his Case service tech.  In every inspection the service tech logs his observations, and in EVERY such report the conditions of Plaintiff's farm are noted as excellent.  See, Exhibit "10", service reports.

57.     Plaintiff in the summer and Fall of 2019 began experiencing increasing problems in the control asserted by Case in retaliation for his continuing complaints about animal cruelty and Case's breach of contract.  He complained to Case about these problems but nothing was done and the retaliation got worse and worse up until Case falsely and fraudulently cancelled his contact.  Such bad acts by Case of retaliation included, by way of example, the following:

   a.  The feed truck delivery driver would leave the top off of the feed silo, (see exhibit "11"), causing rain to get into the feed, causing mold, and even birds and other wild animals.  Plaintiff complained of this to Case but nothing was done.

   b.  The feed truck delivery drivers would scatter feed across his driveway.  (See Exhibit "12").  This was highly unsanitary and would attract vermin like rats.  Plaintiff complained of this to Case but nothing was done.

   c.  Case employees when they pick up the flock at maturity are to capture all chickens, but they started to leave chickens behind, meaning Plaintiff was not paid for such birds left behind, and had to catch them and kill them before the next flock could be delivered.  See, Exhibit "13".  Plaintiff complained to Case of this but nothing was done.

19

d. Case employees would deliver chicks of new flocks with dead birds at the time of delivery. See, Exhibit "14". Plaintiff complained to Case that this meant something was wrong with the birds before he got them, and was unfair to him. Upon information and belief, Case manipulates the "quality" of birds delivered in retaliation against Plaintiff for his complaints.

e. Case changed the composition of nutrition in the chicken feed supplied to Plaintiff, which caused chickens to overheat and die in higher percentages. Plaintiff complained to Case about this but nothing was done.

58. Plaintiff called other area Case grower farmers and was told that they were experiencing similar conditions, or worse, but not to complain or "Case will make an example of you and ruin you."

59. During the course of their relationship, Defendant knowingly and willfully furnished to Plaintiff substandard food for the chicks that resulted in a financial loss to the Plaintiff. Case delivered to Plaintiff a lot of feed containing mold. Said actions were done knowingly and willfully and constitute bad faith on the part of said Case and in retaliation for Plaintiff's continuing complaints to Case about animal cruelty and Case's breach(es) of contract.

60. Following Plaintiff's December 2018 phone message, Defendant knowingly and willfully furnished to Plaintiff diseased chicks that resulted in a financial loss to the Plaintiff. Said actions were done knowingly and willfully and constitute bad faith and retaliation on the part of Case.

20

61.     During the course of their relationship, Defendant knowingly and willfully failed to provide needed medication for the chicks that resulted in a financial loss to the Plaintiff. Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

62.     Defendant deliberately and in bad faith took certain actions that resulted in the inaccurate and deceptive weighing of chickens that resulted in financial loss to Plaintiff. These actions include, but are not limited to, adding thousands of chickens to Plaintiff's houses, that were not included in initial delivery receipts, dramatically affecting his final weights.

63.     Over and above the basic unconscionability of the Broiler Production Agreement, Case did not abide by its own terms imposed by the Agreement.

64.      In December 2019, Plaintiff began receiving phone calls from friends and acquaintances telling him that Case was going to cancel his contract because he had threatened to "go to Case farms with a gun and kill everyone". Plaintiff was absolutely shocked, as he has never said anything remotely close such a thing. Upon information and belief, many current and former Case employees and managers stand ready to testify that Stephen never said any such thing, and never would, being a model farmer.

65.     Plaintiff called Case Farms in December 2019, and was told that his "service man", Guy Perkins, had reported that he made such a threat of violence, and that it was being investigated by Case's Human Resources, and that someone would contact him to get his side of the story. Plaintiff asked Case's Vice President of Operations, John Strange, how it was that people in the community were aware of such allegation, including Case's plan to terminate his contract, before anyone had told him, but John Strange had no answer. In this telephone call,

Case's Vice President John Strange said nothing about any chicken production or performance issues, at all. Indeed, at no time ever has any Case manager ever advised Plaintiff of any issue with his chicken production, and as noted, every written report ever received identifies him as far above average in performance.

66. John Strange lied to Plaintiff. Nobody called Plaintiff. Instead, Plaintiff next on January 2, 2020 received a one-page Notice of Termination letter, attached as Exhibit "15". This letter was dated December 16, 2019, prior to Plaintiff's phone call with John Strange! This letter for the first time identifies a chicken production issue as a reason for his contract termination, even though Plaintiff had never been placed on any performance improvement or density reduction plan in accordance with Case's own published policies.

67. Since receiving the notice of termination, Plaintiff has attempted to secure mitigating contract with the only other chicken aggregator in the area, Tyson. Plaintiff has been told that Tyson will not do business with him because they have heard from Case that he has threatened violence, which is absolutely false and willfully intentionally defamatory.

68. Plaintiff has spoken with other area farmers who report that it is widely known in the community that Case management became angry about Plaintiff complaining (about Case's breaches of contract and animal welfare issues), and determined to make an example of him and "ruin him".

69. Plaintiff's latest flock was to arrive in the first week of January 2020. Case's decision to terminate Plaintiff's contract and cease sending flocks leaves Plaintiff with no means of paying his mortgage that he took out on his farm to build the chicken houses, including the home of his family, in which his mother was born and raised.

22

70.     Before Case stopped placing chicks on Plaintiff's farm, Plaintiff had planned to operate broiler houses on the farm for at least thirty (30) years.

71.     Plaintiff reasonably relied on the Case's representations concerning the longevity of the relationship and the promises from Case personnel that they would be placing chicks on his farm until his age of retirement, in thirty years, to his detriment and did not know that the representations were false until Case informed him that they would not be placing chicks on his farm and subsequently failed to provide chicks in January 2020.

72.     Plaintiff has spoken with his bank, and been told that if he does not have a chicken contract, he will need to place his family farm up for sale as security for his loans.  The loss of family farm purchased by his grandfather, on which his mother and her generation were born and raised, on which Plaintiff and his siblings were raised, would be a crushing and irreparable harm for which no monetary recovery could ever compensate.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF PACKERS AND STOCKYARDS ACT**

69.     Plaintiff realleges and incorporates by reference in this claim the allegations contained in the preceding and subsequent paragraphs of this complaint.  Case used its power over the Plaintiff and decided to retaliate against Plaintiff because of repeated complaints to Case about supplying dead birds, supplying sick birds, supplying moldy feed, Case leaving feed bins open causing vermin and mold, Case giving him thousands of additional unscheduled chickens throwing off his weight and profit. Plaintiff's performance as a grower for Case has been consistently average or above average.  Thus, neither his performance nor the operation of his farm could have been grounds for the Case's unlawful treatment of the Plaintiff.

73.     Case in Plaintiff's 2012 contract contained no arbitration provision, and in signing his 2016 contract, which added a new arbitration provision, was told that he "had to sign it right now", was told he could not take time to read it, nor consult with an attorney, was falsely told it was identical to his 2012 contract.  He was not provided with a copy of the 2016 agreement at the time he signed it, and not until several years later.  These were unlawful practices violating 7 USC § 197c(a).

74.     Plaintiff's 2016 contract in its arbitration provision did not give a reasonable period of time to remedy a breach of contract that could lead to contract termination.  The 2016 contract provided for immediate termination "upon written notice for any reason".  Neither the 2016 contract, nor December 16, 2019 notice of termination letter, did not provide any reasonable time by which a breach could be remedied, nor afford him any opportunity to rebut the allegation of a breach, rendering the 2016 agreement and the December 16, 2019 termination letter unlawful practices.  See, CFR § 201.217.

75.     The Arbitration provision of the 2016 agreement does not print in "bold conspicuous print: Right to Decline Arbitration".   The 2016 agreement does not disclose that the cost of filing fee for AAA Arbitration to Plaintiff, given the amounts of compensatory damages at issue, would be over $11,000.00, which he clearly does not have.

76.     The December 16, 2019 termination letter does not refer to any rights of appeal, or to rebut the allegations, or even direct Plaintiff to his right to Arbitration.  This violates the Packers and Stockyards Act.

77.     The grounds given to Plaintiff for this unlawful treatment and breach of the terms of the 2016 Agreement was a pretext for the actual reason, which was to punish Plaintiff

financially, to put Plaintiff out of the poultry business and to stop his advocacy on his own behalf and on behalf of similarly situated Case growers.

78.     The conduct described above constitutes unjustly discriminatory and deceptive practices by Case and its agents and employees, all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(a).

79.     The conduct described above resulted in Plaintiff being subjected to undue and unreasonable prejudice, and disadvantage; all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(b).

80.     Case's breach of its poultry growing arrangement with Plaintiff was without economic justification and thus, were in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(b).

81.     Cases unconscionable contract with Plaintiff, and December 16, 2019 termination letter to Plaintiff, violate 7 U.S.C. § 192c.

82.     As a direct and proximate result of Case's violations, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

<u>**COUNT II**</u>
<u>**FRAUD**</u>

83.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

84.     Case in 2012 and many times since represented to Plaintiff that as long as he grew good birds, he would continue to receive placements of baby chicks from Case.

25

85.     Case's representation that he would continue to receive chickens was the primary inducement for Plaintiff to enter into the agreement with Case as well as expend funds to improve his chicken houses. A well- constructed poultry facility has a life span of approximately 30 years and Plaintiff needed at least fifteen (15) years just to pay off the indebtedness.

86.     Case knew that their representations to Plaintiff that he would continue to receive chickens as long as he grew good birds were false and were intended to induce Plaintiff to improve his facilities at his expense and to continue to contract with Case.

87.     Plaintiff reasonably relied on the past statements of Case and did not know that the representations were false until receiving Case's December 16, 2019 termination letter on January 2, 2020, that chicks would not be arriving as contractually scheduled.

88.     Plaintiff reasonably relied on the Case's representations concerning the longevity of the relationship and the promises from Case personnel that they would be placing chicks on his farm to his detriment and did not know that the representations were false until Case informed him that they would not be placing chicks on his farm and subsequently failed to provide chicks in January of 2020. To date Case continues to refuse to supply chicks to Plaintiff's farm.

89.     As a direct and proximate result of Case's intentional and willful fraud, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

26

## COUNT III
## BREACH OF CONTRACT

90.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

91.     Case deliberately and maliciously refused to honor the requirements of Plaintiff's contract to continue to place birds on Plaintiff's farm.  Case breached its contract with Plaintiff by deliberately dumping dead birds upon delivery, by delivering more birds than scheduled to throw off his weight/payments, and various other wrongful conduct identified above.

92.     As a direct and proximate result of Case's violations, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

93.      Plaintiff re-alleges each and every allegation set forth above, and thereby incorporates same by reference, is if all were set forth fully herein.

94.     Plaintiff's contracts with Case, in 2012, and 2016, as well as the longstanding relationship between the parties contains an implied covenant of good faith and fair dealing that the parties would deal fairly and honestly with each other and would not do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of their agreements.

95.     Case intentionally took actions to destroy Plaintiff's business.  Defendant acted in bad faith by alleging baseless defaults, imposing arbitrary restrictions and obligations on

27

Plaintiff, and intentionally manipulating Plaintiff's ranking in the tournament system, and falsely defaming Plaintiff to the entire community in a successful effort to destroy his ability to mitigate with another company.

96.     Case thereby breached its duty of good faith and fair dealing with Plaintiff by, inter alia, taking actions to destroy Plaintiff's business. As a direct and proximate result of the intentional wrongful acts of the Defendant and its agents, Plaintiff suffered damages and, if evicted from its property will suffer even more significant damages including but not limited to imminent loss of its property, loss of profits, loss of goodwill, attorneys' fees, and other legal expenses.

97.     As a result of the actions of Case have violated the implied covenant of good faith and fair dealing contained in the agreements as against Plaintiff herein, and as a result thereof, Plaintiff is entitled to his damages incurred.

98.     The foregoing actions were intentional, willful and wanton, and done toward Plaintiff with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Case.

**COUNT V**
**VIOLATION OF N.C.G.S. CHAPTER 75**

99.     Plaintiff re-alleges each and every allegation set forth above, and thereby incorporates same by reference, is if all were set forth fully herein.

100.     Case's actions in connection with this matter violate the federal Packers an Stockyards Act of 1921, 7 USC § 191, et seq., each of which constitutes an unfair method of competition or unfair or deceptive act or practice (the "Unfair Trade Practices") in violation of Chapter 75 of the North Carolina General Statutes.

101.    Defendant Case's actions as stated herein constitute Unfair Trade Practices, which include, but are not limited to:

a.  Case mispresented the opportunity for financial profits in inducing Plaintiff to enter into a grower contract relationship;

b.  Case misrepresented its promise to continue to supply chicks and that Plaintiff could continue to raise birds for Case until he retired;

c.  Case intentionally and in retaliation for Plaintiff's complaints of animal cruelty and mistreatment by Case, and Case's failure to perform under its contractual obligations, manipulated its "tournament system" by giving Plaintiff thousands of extra unscheduled birds that brought down his weight and ranking in the tournament;

d.  Case misrepresented the legal terms of the 2012 and 2016 contracts, depriving him of the opportunity to read and review them before signing, telling them he "must sign right now", not giving him copies at the time of signing;

e.  Case's 2012 and 2016 contracts violate the Packers and Stockyards Act, and are thus unfair trade practices, in that they do not provide Plaintiff with notice of alleged breach, right to cure much less even respond to notice of alleged breach, by not conspicuously and boldly identifying the right to reject arbitration or costs of arbitration, and by manipulating Plaintiff's ranking in the "tournament system";

f.  By Case spreading false lies into the community that Plaintiff had threatened violence, when this was not true, and any reasonable investigation would show it not to be true, in a deliberate (and successful) effort to destroy

Plaintiff's reputation in the community in order to (successfully) destroy his ability to obtain mitigation chicken grower contracts with another company;

g. By retaliating against Plaintiff for his complaints to Case about animal welfare and humane treatment of animals by deliberately giving him substandard birds arriving dead at his farm, by manipulating contents of feed to cause damage to Plaintiff's flocks, by feed truck drivers delivering moldy feed, and other methods and tactics of retaliation;

h. Defendant Case otherwise engaged in unfair methods of competition or unfair or deceptive acts or practices in this matter;

i. Such acts are in and affecting commerce; and

j. Such acts are the direct and proximate cause of damages to Plaintiff.

102.    As Plaintiff's damages are a direct, foreseeable, and proximate result of Case's Unfair Trade Practices, Plaintiff is entitled to recover such damages, including treble damages/punitive damages and attorney's fees as set forth in Chapter 75 of the North Carolina General Statutes, in an amount to be determined at trial.

### COUNT VI
### DEFAMATION and DEFAMATION PER SE
### (versus Defendants Case and Perkins)

103.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

104.    In December 2019, Plaintiff began receiving phone calls from friends and acquaintances telling him that Case was going to cancel his contract because Guy Perkins told Case that Plaintiff had threatened to kill him and bring a gun to Case offices and kill everyone there.

30

105. One witness testifies that a Case Farms service man told him on December 17, 2019 that Stephen Parker was having his contract cancelled because Stephen "had threatened to string them up by their balls in his barn and shoot them." Other witnesses testify that such defamatory messages about Plaintiff were spread by Case Farms feed truck drivers publicly broadcast across CB radio on the same date.

106. Such statement by Guy Perkins and other Case employees was intentionally and willfully false and defamatory per se, made with intention to damage Plaintiff's reputation in the community, and to destroy Plaintiff's ability to obtain mitigating contract with another chicken company.

107. Upon information and belief, multiple Case employees and managers deliberately spread Guy Perkins' lie into the community with intention to damage Plaintiff's reputation in the community, and to destroy Plaintiff's ability to obtain mitigating contract with another chicken company.

108. Such defamatory per se statements by Guy Perkins were made in the course and scope of his employment with Case for which Case is vicariously liable.

109. As a direct and proximate result of the intentional wrongful acts of Case, and its employees including Defendant Perkins, Plaintiff suffered damages and, if evicted from its property will suffer even more significant damages including but not limited to imminent loss of its property, loss of profits, loss of goodwill, attorneys' fees, and other legal expenses.

110. The foregoing actions were intentional, willful and wanton, and done toward Plaintiff with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Case and Perkins.

## COUNT VII
## DECLARATORY JUDGMENT

111.  Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

112.  Plaintiff's 2016 agreement with Defendant Case on its face violates the federal Packers and Stockyards Act and regulations and is invalid.

113.  Defendant Case's December 16, 2019 termination of Plaintiff's 2016 agreement violates the federal Packers and Stockyards Act, and is invalid, null and void.

114.  Plaintiff seeks and is entitled to a declaration that Defendant Case's December 16, 2019 termination of contract letter is invalid, null and void.

115.  Plaintiff seeks and is entitled to a declaration reforming the 2016 contract into compliance and consistent with the federal Packers and Stockyards Act and regulations.

116.  Plaintiff seeks and is entitled to a declaration that the 2016 contract's arbitration provisions are invalid, null, and void as they violate the federal Packers and Stockyards Act and regulations, and that Case cannot compel Plaintiff to arbitration in this matter, and that Plaintiff is entitled to a jury trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Stephen Douglas Parker requests that the Court award the following relief:

1.  Judgment declaring that, pursuant the contracts and federal law, the December 16, 2019 termination of contract was invalid, null and void;

2.  Temporary Restraining Order, Preliminary and Permanent Injunction compelling Defendant Case's specific performance to continue supplying birds under the 2016 contract;

32

3.      An award of compensatory, incidental, consequential, treble and/or punitive damages in an amount to be determined at the trial of this matter, in favor of Plaintiff and against Defendants;

4.      An award of pre- and post-judgment interest, attorneys' fees, expenses, costs, and disbursements pursuant to N.C. Gen. Stat. § 75-16 et seq. or other applicable law, against Defendant;

5.      A jury trial on all issues so triable; and

6.      Such other and further relief as the Court deems just and proper.

Dated: January 10, 2020                    POPE AYLWARD SWEENEY &
                                           STEPHENSON, LLP


                                    By      /s/ Jeremy A. Stephenson, Esq.
                                           Jeremy A. Stephenson (NC Bar 34623)
                                           jstephenson@passlawyers.com
                                           6701 Carmel Road, #105
                                           Charlotte, NC 28226
                                           Phone: 704 414 7301
                                           Fax: 704 759 8996
                                           Attorneys for plaintiff

33

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. __1:20-CV-11_____

| | |
|---|---|
| STEPHEN DOUGLAS PARKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CASE FARMS, LLC, and GUY PERKINS, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

### VERIFICATION OF COMPLAINT

I, STEPHEN DOUGLAS PARKER, being over the age of 21, and of sound mind and competent to testify, having first been duly sworn and cautioned, state under oath as follows:

1. I am the plaintiff in this action.
2. I have read all of the paragraphs of the Complaint in this action.
3. All of the allegations in the Complaint in this action are true and correct to the absolute best of my knowledge, information and belief.
4. All records attached as exhibits to the Complaint are true and correct copies of business records kept and maintained in the usual course of my business as a chicken farmer, and photographs taken by me truly and accurately portraying the images shown.

_____
STEPHEN DOUGLAS PARKER

STATE OF NORTH CAROLINA
COUNTY OF Catawba

Sworn to and subscribed before me
On this the 10 day of January, 2020.

_____
NOTARY PUBLIC
My Commission Expires: 6/21/2020

[official stamp/seal]

ROBIN MCCOSH
Notary Public
Catawba Co., North Carolina
My Commission Expires June 21, 2020